# 1

**The Offense Conduct**                                                PSR 24,28

21.    Information pertaining to the offense was provided by the Assistant U.S. Attorney; from Federal Bureau of Investigation (FBI) records; from HMI records; from statements of Mr. Akers and his attorney; and from statements of Mr. Grimm and his attorney.

22.    Jerry Akers and Kevin Grimm were longtime friends who devised and executed a scheme to defraud HMI of money. They used the U.S. mail and e-mail in furtherance of the scheme.

23.    Mr. Akers and Mr. Grimm are electrical engineers by training and experience. HMI employed Mr. Akers, and Mr. Grimm previously worked there as an outside vendor.

24.    In 2010, Mr. Akers suggested Mr. Grimm create a new company that would ostensibly provide natural gas ordering and transportation services to HMI. In response, Mr. Grimm created an entity called KJ Gas Transportation, LLC (KJ Gas). Mr. Grimm established this company even though he had no experience arranging and transporting natural gas or any technical or logistical ability to provide such services. Mr. Akers set up a vendor account at HMI for KJ Gas as a means for Mr. Grimm to bill HMI for natural gas services it never provided.

25.    After setting up vendor documentation at HMI, Mr. Akers told Mr. Grimm what to charge the company each month and how to configure the invoices even though KJ Gas provided no services.

26.    Mr. Akers and Mr. Grimm communicated by e-mail using jerry_akers@hermanmiller.com and kevingrimm@altelco.net. Using data supplied by Mr. Akers via e-mail, Mr. Grimm created monthly invoices on a computer in his residence and e-mailed HMI the invoices requesting payment. HMI paid KJ Gas on the fraudulent invoices by sending checks through the U.S. mail to Mr. Grimm's home. Mr. Grimm did not provide services or gas to HMI. In fact, another legitimate company was providing natural gas to HMI, and Mr. Akers was doing whatever work was necessary to receive the gas deliveries as an employee of HMI.

27.    In 2015, after an internal audit, HMI discovered KJ Gas was improperly billing HMI for Michigan sales tax, "overcharging" HMI by nearly $100,000.00. Mr. Grimm charged and collected, but never actually remitted any state sales tax to Michigan. To attempt to fix the problem, Mr. Akers had Mr. Grimm "credit" HMI the overbilled amount on several future invoices. As a result, HMI paid KJ Gas no monies for a few months. KJ Gas simply applied a fake credit to the false amount payable. HMI eventually terminated the KJ Gas contract in July 2015. HMI hired private investigators, Quest Consultants International, Ltd., to investigate KJ Gas.

28.    On October 28, 2015, investigators interviewed Mr. Akers about his dealings with KJ Gas and Mr. Grimm. Mr. Akers admitted devising the fraudulent scheme and executing it with Mr. Grimm. Mr. Akers provided the following written statement with the assistance of investigators. Mr. Grimm, through his attorney, disputes some of the

PSR 29

providing these services to HMI, I provided all of the data that KJ Gas needed to invoice HMI on a monthly basis.

Both Kevin Grimm and I knew that the billing and the subsequent payments from HMI were fraudulent. During the five years of KJ Gas' contract with HMI, I received between $30,000 and forty thousand dollars from Grimm. I also received close to $40,000.00 from Grimm for the purchase of a pontoon boat. One of the motivators for helping Kevin Grim was the hope that I would be able to acquire his company after he retired since he was 10 years older than I was.

I now realize that helping Kevin Grimm in his business ventures was a bad idea and I regret becoming involved.

29.   After Mr. Akers' interview, investigators visited Mr. Grimm at his residence to inquire about KJ Gas; however, he would not discuss the contract with HMI but volunteered that it involved the transportation of gas through pipelines by KJ Gas. When the discussion turned to allegations of fraud, Mr. Grimm asked investigators to leave his property.

30.   On November 16, 2015, Mr. Akers, represented by counsel, participated in a proffer-protected interview with the Assistant U.S. Attorney and the FBI. Mr. Akers confirmed statements he previously made to private investigators. He added energy usage was based on open market pricing and was just like a stock portfolio and changed every day. One would mix and match the energy needs on a daily basis, and each building (site) had a different consumption rate which was independent of the outside weather. HMI's policy was to have multiple bids, but the gas contract was a little different because it involved a minority company. Mr. Akers said senior bonuses were tied to the amount of money spent on minority contracts. The gas companies were to provide daily nominating supply and balancing services. He explained, the gas company would tell the pipeline company the needs required for HMI at each site. A company would often buy their utility needs through a gas marketer. He conducted the analysis initially with the assistance of HMI's purchasing agent. Mr. Akers stated he discovered the gas marketer was double nominating in 2001 to 2002, and the analysis defaulted back to him (Akers).

31.   Mr. Akers explained he got involved in the renewable energy "stuff" at HMI and thought it would be to Mr. Grimm's advantage to get involved in that line of business. Mr. Akers stated his boss did not know what he did or anything about renewable energy, and he was slapped down for going around his boss. Mr. Akers said Mr. Grimm formed UP Energy which was responsible for selling renewable energy credits. Mr. Akers said he approved the contract between HMI and UP Energy (he did not indicate whether he did so with the company's permission). Mr. Akers said Mr. Grimm did not treat his customers well and HMI ended the contract after two years. Mr. Akers reported he did not receive payment for assisting Mr. Grimm, but he did receive a trip to Key West, Florida. After the presentence report was disclosed, Mr. Grimm, through his attorney, said he formed UP Energy at Mr. Akers' suggestion. Mr. Grimm also denied gifting Mr. Akers a trip to Key West.

PSR 37

32.     Mr. Akers said Mr. Grimm's gas service company, KJ Gas, started approximately five years ago and was started similar to UP Energy. Mr. Akers stated his boss told him not to do the purchasing job anymore, but he thought it would good to have Mr. Grimm do the gas analysis work. Mr. Akers had Mr. Grimm consult with HMI's purchasing department to get established as a vendor. Mr. Akers provided the details Mr. Grimm needed to get started.

*NOT TRUE NEVER COOPA THM*

33.     Mr. Akers admitted creating the invoices from information obtained from another company. He sent the information to Mr. Grimm who then forwarded the information to HMI's accounts payable department. Mr. Akers claimed HMI trusted other people, but not their own to do the work. He stated he did not care what happened because he was unhappy with HMI.

34.     Mr. Akers said he began receiving cash and "stuff" from Mr. Grimm. Mr. Akers said Mr. Grimm purchased a boat, a Mini Cooper worth approximately $15,000.00, and a boat dock for him. Mr. Grimm stored the boat at Halls Motor in Muskegon. He sent envelopes containing at least $3,000.00 cash at least once per month, and sometimes more frequently. Mr. Akers estimated receiving $150,000.00 to $200,000.00 cash from Mr. Grimm. Mr. Akers admitted using some of the money on prostitutes. After the presentence report was disclosed, Mr. Grimm, through his attorney, denied purchasing the boat for Mr. Akers but admitted sending money at Mr. Akers' request.

35.     Mr. Akers acknowledged KJ Gas was a fraudulent creation from the beginning. He did all of the work as an employee of HMI. He accessed the web portal on a daily basis and emailed information to Mr. Grimm, who in turn emailed invoices for payment to HMI.

*NOT DAILY ONCE AMONTH*

36.     Mr. Akers stated Mr. Grimm suspected they were scamming HMI and specifically questioned him about it a couple of times. After the presentence report was disclosed, Mr. Grimm, through his attorney, denied asking if they were scamming but admitted repeatedly asking whether the business was legitimate.

37.     On December 2, 2015, FBI agents executed a federal search warrant at Mr. Grimm's residence during which he admitted owning KJ Gas. He stated he was the only employee and started the company because Mr. Akers said HMI could not transport its gas. Mr. Grimm said KJ Gas was in the natural gas transport and distribution business. He said Mr. Akers told him that HMI would take care of everything and that he (Grimm) would be the face of the company. Mr. Grimm stated he kept asking Mr. Akers if the business was legitimate. Mr. Grimm said he copied the billing information received from Mr. Akers into an invoice and sent it to HMI for payment. He stated, "I was paid over $1 million dollars for not doing anything." He admitted "gifting" some of the money to Mr. Akers. He also admitted "quit-claiming" his home to his wife after HMI investigators questioned him about the fraud. Mr. Grimm claimed he was "willfully blind" to what Mr. Akers was doing. Mr. Grimm cried and said, "If someone else actually transported gas, this was wrong."

38.     At the end of the interview, Mr. Grimm adopted and signed a handwritten statement prepared by an FBI agent admitting, in part: "I did not feel this was a [sic] honest thing to

PSR 44,45

Energy board and attended conferences. Mr. Akers wanted the money to pay for hookers, which was usually $3,000. Mr. Grimm recalled cashier's checks to Mr. Akers on a few occasions for a pontoon boat, dock, and a vehicle for Mr. Akers' son.

43.    Mr. Grimm stated most of the money (90%) for Mr. Akers came out of the account labeled "J's." Mr. Grimm also thought he completed a Time of Death (TOD) statement on other accounts listing Mr. Akers as the beneficiary. Mr. Grimm said he received an Excel spreadsheet on a monthly basis containing usage figures from HMI, which could have been sent by Mr. Akers. Mr. Grimm said he would take the detail from the spreadsheet and create an invoice in PDF format. He would send the PDF file back to HMI via email to get paid. Mr. Grimm estimated it took about ten minutes to create the PDF file. Mr. Grimm said he received the monthly check from HMI through the U.S. Postal Service. He deposited the check into the KJ Gas account which would sit in the account until the end of the year.

44.    Mr. Grimm stated he sat on the money for a couple of months when the business first started. He thought the checks would be smaller than what they were. He thought KJ Gas would be the replacement retirement that he lost in his divorce. He viewed the company as retirement savings for himself. He thought he asked Mr. Akers if the business was legitimate, but stated he asked if Mr. Akers was ok with HMI and at risk of losing his job. Mr. Grimm said he was reassured everything was ok. Mr. Grimm was concerned for his friend, who was a 50% partner. Mr. Grimm never called anyone else at HMI nor inquired about the legitimacy of KJ Gas business.

45.    Mr. Grimm stated KJ Gas stopped doing business because HMI noticed they were paying sales tax for a service. HMI completed an investigation and determined sales tax was not supposed to be charged by KJ Gas for services performed. After the sales tax was refunded to HMI through credits on future invoices, HMI canceled their contract with KJ Gas. Mr. Grimm said he collected sales tax from HMI and did not send any of the collected sales tax to the State of Michigan. However, he paid Michigan and federal income taxes on the money received from HMI. Mr. Grimm said the first time he heard about KJ Gas being involved with fraud was when two investigators showed up at his residence. He said the investigators mentioned something about HMI and fraud. He said he asked them to leave because he didn't know what fraud meant. He knew it was wrong, but stated he had to look up the term in a dictionary before he understood what the term meant. Mr. Grimm stated at no point did Mr. Akers ever tell him the transportation of gas was a scam. Mr. Grimm said he would have stopped on the spot had Mr. Akers told him. Mr. Grimm stated he never saw gas getting transported and did not see any tangible, physical item for KJ Gas. He thought Mr. Akers negotiated something with HMI to transport natural gas and he just trusted Mr. Akers.

46.    Mr. Grimm stated when Mr. Akers showed up at his residence on November 19, 2015, he asked Mr. Akers if "we" transported gas. Mr. Grimm said Mr. Akers told him at that time they did not. Mr. Grimm did not recall telling Mr. Akers not to discuss anything over the telephone except during Mr. Akers' November visit to Mr. Grimm's residence.

11

ATP 4                                        4

1             MR. CHAMBERLAIN:  Thank you, your Honor.

2             We addressed this issue in our sentencing memorandum,

3    which I believe the Court's had an opportunity to review.  I'll

4    keep my comments brief.

5             We simply submit, your Honor, this is more in the

6    nature of a partnership than any hierarchial organization, that

7    while Mr. Akers was the proverbial insider, he wasn't

8    necessarily in control.  Mr. Grimm had other aspects of the

9    operation over which he had control, most notably the money.

10   We respectfully submit that under these circumstances, it

11   doesn't apply.

12            THE COURT:  All right.  Thank you, sir.

13            As Mr. Chamberlain's already indicated, the Court's

14   had the benefit his sentencing memorandum and supplemental and

15   a motion for a variance, which is ECF Documents 22, 23, and

16   26.  The government has filed a sentencing memorandum

17   addressing this issue also, which is ECF 21, and I have the

18   government's motion, which is ECF 20.

19            Mr. O'Connor, on aggravating role, sir.  Go ahead.

20            MR. O'CONNOR:  Thank you, your Honor.  I'll also rely

21   on that sentencing memorandum just referenced by the Court.

22            Very simply, I would state that Mr. Akers was the

23   organizer of this conspiracy, because Mr. Grimm pretty much did

24   nothing except turn the numbers around that he received from

25   Mr. Akers on that spreadsheet every month and turn it into an

ATP5                                                    5

1    invoice and emailed that invoice back to Herman Miller.   There

2    really was no other organizational activity or control by Mr.

3    Grimm.   All of that is detailed in my memo that came from

4    Mr. Akers.   It was Mr. Akers who designed the scheme, who had

5    Mr. Grimm submit the required paperwork to the company in order

6    to get him on the books as a vendor who was authorized to

7    perform services and bill the company.   Everything was

8    controlled and managed through Mr. Akers.   Mr. Grimm simply

9    invoiced the company and held onto the monies and distributed

10   the monies when Mr. Akers requested some payments.   So for

11   those reasons, and all the reasons in the memo, as well as the

12   exhibits that we attached demonstrating all of this organizing

13   activity by Mr. Akers, we respectfully request that the Court

14   find that he was an organizer under the guidelines.

15            Thank you.

16            THE COURT:  All right.  Thank you, sir.

17            In the Court's judgment, this case is controlled, at

18   least in significant measure, by United States vs. Tanner, at

19   837 F.3d 596, specifically at Page 603.  The facts as laid out

20   in the presentence investigation report clearly indicate that

21   Mr. Akers invited Mr. Grimm into this fraud.  It was Mr. Akers'

22   expertise in the subject matter that was critical to the

23   success of the scam until it was discovered, and the Court

24   notes Exhibits 1 through 5 attached to the government's brief

25   where it's clear that this defendant played a key role in the

GSM-3

- Month after month, Defendant simply opened an e-mail from Akers containing gas delivery numbers, converted the information into a KJ Gas Transportation invoice, and e-mailed the invoice to HMI with the message: "Thanks for the work!" (Exhibit 1: Mar. 2, 2015 e-mail to HMI attaching invoice)

- Defendant even pocketed about $100,000 in "sales tax" he charged HMI instead of paying those monies to the State of Michigan like a real business.

- When HMI representatives first inquired about his business and invoices, Defendant would not discuss his business with them. When one of the investigators used the word "fraud," Defendant asked them to leave his property.

(R.28: PSR ¶¶24, 27, 29, 37)

Defendant appears to invoke the legal doctrine of "deliberate ignorance" to attempt to minimize his role in the offense. Defendant does not dispute that he is legally responsible for his actions, but wants this Court to believe that he deliberately ignored the high probability that he was executing a scheme to defraud HMI of money and closed his eyes to what was obvious. *See, e.g., Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-69 (2011) (willful blindness is "well-established in criminal law" because defendants cannot "deliberately shield[] themselves from clear evidence of critical facts that are strongly suggested by the circumstances."); *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012) (deliberate ignorance jury instruction, also known as the "ostrich" instruction, is appropriate when defendant claims a lack of guilty knowledge and the evidence support an inference of deliberate ignorance).

This Court should not believe that Jerry Akers was a criminal mastermind who initially tricked Defendant into participating in the fraud. Defendant is not the gullible fool he attempts to portray. He is highly educated and trained. (R.28: PSR ¶¶98-100) He conceived of and operated

GSM-4

a successful *real* energy consulting business, Power Systems Solutions, that performed *real* consulting work. (*Id.*, ¶104)  Before that, he was employed as a senior sales engineer, including at General Electric. (*Id.*, ¶¶105-106)  Defendant knows how legitimate businesses operate and knew that a gas transportation company working for a large manufacturer like HMI could not generate $1.77 million in revenues with no cost of goods sold or other direct operating expenses. It defies logic and common sense that a successful businessman like Defendant would believe that he could run a natural gas ordering and distribution business with no employees, infrastructure, or service-related expenses.

Second, when Akers was confronted by HMI about the KJ Gas contract, Akers admitted that it was a scam and told investigators that Defendant also knew that the KJ Gas invoices were fraudulent:  "Both Kevin Grimm and I knew that the billing and the subsequent payments from HMI were fraudulent." (*Id.*, ¶28 at 8)  Although the government does not dispute that Akers and Defendant may have initially discussed forming a legitimate business to provide real services to HMI, any legitimacy in the venture disappeared when Grimm started billing HMI for services he never performed, knew nothing about, and incurred no expenses to provide.

Third, Defendant's claim that he does not fully understand the meaning of the word "fraud" is a phony attempt to explain why he asked HMI investigators to leave his property when he was first confronted about the KJ Gas invoices. (*Id.*, ¶58 at 16)  Not only is such an assertion implausible on its face given Defendant's education and experience, the government found evidence that Defendant fully understood and even used the word "fraud" in his personal life. When a civil lawsuit was filed against him in 2014 by American Express Bank for failing to pay a credit card charge, Defendant sought to dismiss the lawsuit by alleging that he was defrauded by the business.  Defendant wrote a letter stating that he was not responsible for a credit card charge